**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYAN MCCORMACK, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>     v.<br><br>DINGDONG (CAYMAN) LTD., CHANGLIN LIANG, LE YU, YI DING, ERIC CHI ZHANG, WEILI HONG, PHILIP WAI LAP LEUNG, COLLEEN A. DE VRIES, MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CREDIT SUISSE SECURITIES (USA) LLC, MISSION CAPITAL MANAGEMENT LIMITED, HSBC SECURITIES (USA) INC., FUTU INC., TIGER BROKERS (NZ) LIMITED, and COGENCY GLOBAL INC.,<br><br>                    Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Ryan McCormack ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Dingdong (Cayman) Ltd. ("Dingdong" or the "Company"), articles, and other publications, including media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE AND SUMMARY OF THE ACTION

1.       Plaintiff brings this securities class action on behalf of persons who purchased, or otherwise acquired, Dingdong American Depository Shares ("ADS") pursuant or traceable to the F-1 registration statements (including all amendments made thereto) and related prospectus on

Form 424B4 (collectively, the "Registration Statement" or "Offering Documents") issued in connection with Dingdong's June 2021 initial public stock offering (the "IPO" or the "Offering").

2.     This action asserts non-fraud, strict liability claims under §§11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"), against Dingdong, certain Dingdong officers and directors, the underwriters of the IPO, and Dingdong's U.S. representatives (collectively, the "Defendants").

3.     Dingdong purports to be a leading and the fastest growing on-demand e-commerce company in China.  Dingdong conducted its IPO in New York, and its ADS are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "DDL."

4.     In June 2021, as part of Dingdong's IPO, Defendants issued approximately 4.07 million ADS to the investing public at $23.50 per ADS, all pursuant to the Registration Statement.

5.     According to the Registration Statement, Dingdong's mission is to "make fresh groceries as available as running water to every household."  To achieve this end, Dingdong has purportedly "embraced a user-centric philosophy" that is committed to "directly providing users and households . . . ***fresh*** produce, meat and seafood and other daily necessities through a convenient and ***excellent*** shopping experience supported by an ***extensive self-operated*** frontline fulfillment grid." [Emphasis added.]  Critically, Dingdong differentiates itself from its competitors by claiming to "procure . . . products primarily from direct upstream sources such as farms and cooperatives," "***apply stringent quality control across [its] entire supply chain to ensure product quality to [its] users***," and rely on its "frontline fulfillment grid and robust, digitalized fulfillment capabilities . . . [to] deliver . . . orders within 30 minutes."  [Emphasis added.]  Indeed, at the time of the IPO, they were these very capabilities that the Offering Documents cited as the reasons why

Dingdong achieved "significant scale in [the] industry," and observed a "strong and active user base" that saw "increasing engagement and stickiness."

6.      Unbeknownst to prospective investors, however, the Registration Statement misrepresented Dingdong's commitment to ensuring the safety and quality of the food it distributes to the market.  In fact, Dingdong was *actively* flouting its food safety responsibilities, selling, for example, dead fish to customers while marketing it as live fish and recycling vegetables that were past their sell-by date.  In other words, Dingdong was no better at providing or assuring access to "fresh" groceries than the supermarkets, traditional Chinese wet markets, or traditional e-commerce platforms it repeatedly claimed to be displacing.  The foregoing conduct subjected Dingdong to an increased risk of regulatory and/or governmental scrutiny and enforcement, all of which, once revealed, were likely to (and did) negatively impact Dingdong's business, operations, and reputation.  By omitted these facts, Plaintiff and other ADS purchasers were unable to adequately assess the value of the shares offered in connection with the IPO, and thus purchased their ADS without material information and to their detriment.

7.      With these material omissions and misrepresentations in the Registration Statement, Defendants went forward with the IPO, raising *nearly $95.7 million* in gross proceeds.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities that results as investors learned of Defendants' wrongdoing, Plaintiff and other Class members have suffered tens of millions of dollars in damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§11, 12, and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o.

10.     This Court has jurisdiction over this action pursuant to §22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1331.

11.     Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.  Dingdong's ADS are listed on the NYSE, a national securities exchange, located in this District.

12.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of the national securities exchange.

## THE PARTIES

*Plaintiff*

13.     As set forth in the attached Certification, Plaintiff purchased the Company's ADS that were issued pursuant and traceable to the Registration Statement and IPO, and was damaged thereby.

*Defendants*

### A.     Dingdong

14.     Defendant Dingdong is a China-based "fresh" grocery e-commerce company. Dingdong conducted its IPO in New York, and its ADS are listed on the NYSE under the ticker symbol "DDL."

### B.     The Individual Defendants

15.     Defendant Changlin Liang ("Liang") serves, and has served at all relevant times, as a director on Dingdong's Board of Directors (the "Board"), Founder, and Dingdong's Chief

Executive Officer.  Defendant Liang reviewed, contributed to, and signed, or caused the signing of, the Offering Documents.

16.    Defendant Le Yu ("Yu") serves, and has served at all relevant times, as a director on Dingdong's Board and as Dingdong's Chief Strategy Officer.  Defendant Yu reviewed, contributed to, and signed, or caused the signing of, the Offering Documents.

17.    Yi Ding ("Ding") serves, and has served at all relevant times, as a director on Dingdong's Board and as Dingdong's Vice President.  Defendant Ding reviewed, contributed to, and signed, or caused the signing of, the Offering Documents.

18.    Eric Chi Zhang ("Zhang") serves, and has served at all relevant times, as a director on Dingdong's Board.  Defendant Zhang reviewed, contributed to, and signed, or caused the signing of, the Offering Documents.

19.    Defendant Weili Hong ("Hong") serves as a director on Dingdong's Board, having accepted an appointment effective upon the SEC's declaration of the effectiveness of Dingdong's Registration Statement.  Defendant Hong reviewed and contributed to the Offering Documents.

20.    Defendant Philip Wai Lap Leung ("Leung") serves as a director on Dingdong's Board, having accepted an appointment effective upon the SEC's declaration of the effectiveness of Dingdong's Registration Statement.  Defendant Leung reviewed and contributed to the Offering Documents.

21.    Defendant Colleen A. De Vries ("De Vries") served as Senior Vice President of Defendant Cogency Global Inc. ("Cogency Global"), the designated U.S. representative of Defendant Dingdong, and reviewed, contributed to, signed, or caused the signing of, the Offering Documents.

22.    Defendants named in ¶¶15-21 above are collectively referred to herein as the "Individual Defendants."  The Individual Defendants each reviewed, contributed to, signed, or authorized the signing of, the Offering Documents, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the Offering and the Offering Documents, and/or attended or contributed to road shows and other promotions to meet with and present favorable information to Dingdong investors, all motivated by their own and the Company's financial interests.

### C.    The Underwriter Defendants

23.    The following underwriters were also instrumental in soliciting and making the securities in the Offering available to the investing public:

| | |
|---|---|
| Morgan Stanley & Co. LLC | 1,221,600 |
| BofA Securities, Inc. | 1,068,900 |
| Credit Suisse Securities (USA) LLC | 763,500 |
| Mission Capital Management Limited | 1,017,700 |
| HSBC Securities (USA) Inc. | 100 |
| Futu Inc. | 100 |
| Tiger Brokers (NZ) Limited | 100 |

24.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Morgan Stanley served as a joint bookrunner of the Offering, and as a representative of all the underwriters.  Morgan Stanley also participated in conducting and promoting the Offering.  Morgan Stanley's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Morgan Stanley maintains an office in New York, NY.

25.    Defendant BofA Securities, Inc. ("BofA") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  BofA served as a joint bookrunner of the

Offering, and as a representative of all the underwriters. BofA also participated in conducting and promoting the Offering. BofA's participation in the solicitation of the Offering was motivated by its financial interest. Defendant BofA maintains an office in New York, NY.

26.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Credit Suisse served as a joint bookrunner of the Offering, and as a representative of all the underwriters. Credit Suisse also participated in conducting and promoting the Offering. Credit Suisse's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Credit Suisse maintains an office in New York, NY.

27.     Defendant Mission Capital Management Limited ("Mission Capital") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Mission Capital participated in conducting and promoting the Offering. Mission Capital's participation in the solicitation of the Offering was motivated by its financial interest.

28.     Defendant HSBC Securities (USA) Inc. ("HSBC") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. HSBC participated in conducting and promoting the Offering. HSBC's participation in the solicitation of the Offering was motivated by its financial interest. Defendant HSBC maintains an office in New York, NY.

29.     Defendant Futu Inc. ("Futu") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and

misleading Offering Documents.  Futu participated in conducting and promoting the Offering. Futu's participation in the solicitation of the Offering was motivated by its financial interest.

30.     Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Tiger Brokers participated in conducting and promoting the Offering.  Tiger Brokers' participation in the solicitation of the Offering was motivated by its financial interest.

31.     Defendants listed in ¶¶23-30 are collectively referred to herein as the "Underwriter Defendants."

32.     Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents.  In addition, although not an element of Plaintiff's Securities Act claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act.  Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

33.     Each Underwriter Defendant named herein is an investment banking form whose activities include, *inter alia*, the underwriting of public offerings of securities.  As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees.

34.     As underwriters, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information

about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

35.     Representatives of the Underwriter Defendants also assisted Dingdong and the Individual Defendants plan the Offering.  They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

36.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to Dingdong's management, directors, and lawyers to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price of which Dingdong's ADS would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about Dingdong would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Dingdong's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of Dingdong's undisclosed ***then-existing*** problems and plans, and the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

37.     The Underwriter Defendants also demanded and obtained an agreement from Dingdong under which Dingdong agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

38.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with the Offering, so that they, and the Individual Defendants, could offer to sell, and sell, Dingdong shares to Plaintiff and the members of the Securities Act Class pursuant (or traceable) to the Offering Documents.

**D.     Additional Defendants**

39.     Defendant Cogency Global was Dingdong's authorized U.S. representative for purposes of the Offering.  Defendant De Vries, who signed the Offering Documents, is an employee of Defendant Cogency Global.  As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendant De Vries, in its capacity as employer and as a control person under the Securities Act.

40.     Dingdong, the Individual Defendants, the Underwriter Defendants, and Cogency Global are collectively referred to herein as the "Defendants."

<u>**DEFENDANTS' FALSE AND MISLEADING**</u>
<u>**REGISTRATION STATEMENT AND PROSPECTUS**</u>

41.     On June 8, 2021, Dingdong filed with the SEC an initial registration statement on Form F-1, which would be used for the IPO following a series of amendments in response to SEC comments.

42.     On June 28, 2021, Dingdong filed its final amendment to the Registration Statement, which registered 6,385,950 Dingdong ADS for public sale.  The SEC declared the Registration Statement effective that same day.  On June 29, 2021, Defendants priced the IPO at $23.50 per ADS and filed the final prospectus for the IPO, which forms part of the Registration Statement.  Through the IPO, Defendants issued and sold approximately 4,072,000 Dingdong ADS, all pursuant to the Registration Statement, for gross proceeds of approximately $95,692,000.

43.     The Registration Statement contained untrue statements of material fact and omitted to state material facts, both required by governing regulations and necessary to make the statements made not misleading.

44.     In particular, the Registration Statement misrepresented Dingdong's supposedly "***uncompromising***" commitment to product quality, repeatedly emphasizing its ability to "***directly provide users and households with fresh produce, meat and seafood*** and ***other daily necessities***," and frequently touting its "standardization and digitalization . . . [of the] traditional agricultural supply chain," which purportedly addresses the significant issues of supply and quality traditional grocers and their customers face.  [Emphasis added.]  Consistently characterizing Dingdong as an "e-commerce compan[ies] ***with a reliable supply of quality products*** and the ability to provide the core components of the ideal shopping experience," the Registration Statement claims Dingdong has "***reshape[d]***" the Chinese consumer's shopping experience for "fresh groceries," stating in relevant part:

> ***In response to both consumer needs and inadequacies in the traditional supply chain model in the industry***, we launched *Dingdong Fresh*, our mobile app and mini-programs ***to reshape the Chinese consumer's online shopping experience for groceries***.  We entered the industry with fresh produce, meats and seafood as our initial focal point, a segment known for high-frequency orders and relatively difficult procurement and fulfillment operations, and successfully expanded into other product offerings.  ***We have embraced a user-centric philosophy since our inception, and have in the past four years been committed to providing consumers with a wide variety of quality products*** with fast delivery times at attractive prices:
>
> - ***Product quality***.  We procure our products primarily from direct upstream sources such as farms and cooperatives and ***apply stringent quality control across our entire supply chain to ensure product quality*** to our users.
>
> - ***Speedy delivery***.  Powered by our frontline fulfillment grid and robust, digitalized fulfillment capabilities, we deliver almost one million orders per day, and target to get orders within 30 minutes to our users.

11

- ***Product variety***.  **We offer a diversified portfolio of fresh groceries** and other daily necessities tailored for local needs to address a greater share of each family's consumption needs.

[Emphasis added.]

45.     According to the Registration Statement, these capabilities have resulted in Dingdong "achiev[ing] significant scale . . . with a strong and active user base and increasing engagement and stickiness."

46.     The Registration Statement adds to this narrative by describing the Company's efforts to assure "***end-to-end quality control***," through the digitalization of its core operations:

> [W]e have digitalized all of our core operations, building a [sic] full suite supply chain solutions ***to assure end-to-end quality control***, ***which allows us to continuously optimize operating efficiency while providing users with the best products for value***.  We have ***streamlined the farm-to-home supply chain by cutting out intermediaries and guaranteeing strict end-to-end quality control*** through our 7+1 Quality Control Procedure, across the entire procurement and fulfillment process.

[Emphasis added.]

47.     According to the Registration Statement, Dingdong's 7+1 Quality Control Procedures are quite comprehensive and stringent:

> ***We have designed stringent quality control standards and enforced comprehensive quality control measures*** covering every aspect of procurement and sourcing, which crystallize into our 7+1 Quality Control Procedure, namely (i) new product review and approval, (ii) ***original quality inspection during procurement, (iii) inspection upon arrival at regional processing centers***, (iv) sorting, processing and labeling, (v) ***storage and inspection***, (vi) order packaging, (vii) delivery, and (viii) feedback and customer services. . . .
>
> *New Products Review and Approval.*  Before intaking any new product varieties, we conduct a series of quality assurance reviews.  For example, our procurement team will form a sample tasting committee to vet the proposed new products, and our quality control department will decide the compliance status of the product and the manufacturer or distributor.  Subsequently, our information maintenance team will verify and create the new product's commercial information, and the promotional campaigns' data monitoring and optimization will also be evaluated on a continuous basis.

*Original Quality Inspection.*  We carefully grade fresh products from our suppliers at their origins and select fresh products that meet our grading system. Direct cooperation with these local suppliers enables us to increase supply chain efficiency by minimizing supply chain costs and ensure product quality.

*Inspection upon Arrival.*  ***The products are subject to our inspection upon arrival at our regional processing centers***, and we may refuse acceptance of any defective products.  In case of any quality defects that are not due to our negligence in storage, we are entitled to a prompt replacement or refund by the suppliers pursuant to the supply agreement.  ***Our frontline fulfillment stations will also inspect product deliveries before accepting them, and only those meeting our internal quality standards can be eventually delivered to our customers.***

*Sorting, Processing and Labeling*.  Our warehouse management system and automated equipment aid our regional processing centers' sorting, processing and labelling efforts, which minimizes human error and contamination.  For products with a shelf life of less than 60 days, special batch codes will be affixed for easy management.  We also ensure that the shelf life of fresh groceries are adjusted dependent upon seasons to avoid spoilage.

*Storage and Inspection*.  In each of our regional processing centers and frontline fulfillment stations, we set up storage areas with different temperature layers for different products.  As we set a specific shelf life for and are able to monitor the shelf life of each product, ***we are able to ensure that only products within two thirds of the shelf life are sold to our customers***.

*Packaging.*  To ensure the freshness of our products, our system automatically generates instructions for order packaging, which takes into account the customer's requested delivery time and calculates the time when the order should start to be packaged.

*Delivery*.  After order packaging is completed, our system assigns the order to the most conveniently situated rider, automatically generating the optimal pathing for delivery.  We allow users to track the shipping status of their orders through our mobile app and rate riders.  We are committed to transporting and delivering all of our fresh groceries by self-operated cold chain logistics.

*Feedback and Customer Services*.  Our mobile app provides instant responses to customer feedback, and we maintain a customer service hotline so that we can timely address complaints and make corresponding improvements to our services and products.  See "The *Dingdong Fresh* Experience – Customer Service."

[Emphasis added.]

48.    In addition, the Registration Statement credits the Company's supposed "pioneer[ing]" self-operated frontline fulfillment grid model for helping to deliver the freshest products:

> *We were one of the pioneers in using a frontline fulfillment grid model to address last-mile delivery for fresh groceries* while still scaling rapidly. On average, each station under our frontline fulfillment grid can directly reach over tens of thousands of households in the neighborhood with the ability to realize our 30 minute delivery target, *greatly assuring the freshness [of] the products when they reach users*. In addition, compared with the offline retail store model, the frontline fulfillment grid model is less dependent on site selection and front-end operators, has faster inventory turnover and has greater scalability in terms of rapidly addressing new regional markets and user demographics. Our frontline fulfillment grid is supported by 40 regional processing centers that sort, package, label and store raw products prior to fulfillment.

> Compared with the franchise model, *our self-operated frontline fulfillment grid model provides more alignment of interests across our organization to assure our product quality*, speedy delivery and product variety to consumers and digitalization throughout our operations.

[Emphasis added.]

49.    Likewise, Dingdong's "[s]trong sourcing and procurement capabilities" supposedly afford it the ability to "better ensure . . . product quality":

> *To better ensure our product quality, we have deeply focused on cultivating our upstream sourcing capabilities and modernizing the highly fragmented agricultural supply chain*. We work closely with our upstream suppliers, such as farms and cooperatives, to seamlessly integrate their operations with ours. We offer them not only large order flow, but also accurate demand projections so that they can perform demand-based production. We also empower them through sharing data-driven insights and research, such as proliferating the implementation of our proprietary, scientific D-GAP agricultural planting standard without additional costs to suppliers to improve the quality of the products we source at their place of production. *Our close collaboration and high engagement with our suppliers assure us a reliable and diverse supply of high-quality products*, and continuously strengthen our bargaining power and procurement cost advantages.

> Leveraging our in-depth industry experience and large-scale procurement advantages, we have begun to build our own brands to increase consumer recognition and stickiness. We select product types and categories with high

purchase frequency, inelastic demand, high scalability, outdated supply and fulfillment chains and high potential for growth.

> ***Our close ties with upstream suppliers allow us to maintain a stable supply of quality products*** while reducing our procurement costs.

[Emphasis added.]

50.    The Registration Statement adds in relevant part:

> ***We select suppliers on the basis of their reliability***, logistics capabilities, productivity, ***food safety assurance*** and pricing.  ***They must be able to meet our demands for timely supply of fresh and safe products***.  We perform background checks on our suppliers and the products they provide before we enter into any agreement.  We examine their business licenses and the qualification certificates for their products, check their brand recognition and conduct background investigations into their cooperation history and partners.  We also conduct on-site visits to assess and verify their farming locations, business scale, management experience, production capacity, logistics capabilities, and quality control system.  ***As food safety is our top priority, all of our suppliers are required to be outfitted with applicable facilities, equipment and personnel to inspect pesticide residue and to be able regularly conduct testing and generate quality reports for their products***.  In addition, we also require our suppliers to have complete and flexible logistics capabilities, including cold chain logistics, to ensure a sustainable and timely supply of our fresh groceries.  Once a supplier is selected, we conduct a one-month trial run to test its overall capabilities.

[Emphasis added.]

51.    In truth, however, ***at the time of the IPO***, Dingdong was ***actively*** flouting its food safety responsibilities, failing to deliver on its ***stated*** commitment to provide "fresh" groceries to customers historically disserved by supermarkets, traditional Chinese wet markets, or traditional e-commerce platforms.  Dingdong's quality control measures, which were so heavily touted in the Registration Statement, were, in fact, inadequate, exposing Dingdong to an increased risk of regulatory and/or governmental scrutiny and enforcement.  Because the Registration Statement misled prospective investors about Dingdong's commitment to the safety and quality of the food it distributes to the market and failed to disclose the truth about Dingdong's lack of sufficient and

effective quality control policies and procedures, Plaintiff and other ADS purchasers had no opportunity to adequately assess the value of the shares offered in connection with the IPO.

52.     Defendants were required to disclose this material information in the Registration Statement.  Item 303 of SEC Regulations S-K, 17 C.F.R. §229.303 imposed an independent duty on Defendants to disclose in the Offering Documents any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.  As of the IPO and the issuance of the Offering Documents, Defendants were aware, but did not disclose, that Dingdong's quality control policies and procedures were insufficient and/or ineffective, and that its so-called "uncompromising" commitment to product quality was merely lip-service, utilized to both differentiate the Company from competitors in the intensely competitive e-commerce industry and to warrant a premium IPO offering price.

53.     The failure of the Offering Documents to disclose material adverse information violated Item 105 of SEC Regulations S-K, 17 C.F.R. §229.105 ("Item 105").  Specifically, Item 105 provides, in pertinent part, that the "Risk Factors" section of offering documents filed with the SEC discuss the most significant factors that make an offering risky or speculative and that each risk factor adequately describes the risk.  The Offering Documents discussion of risk factors were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose that the potential future adverse impacts described were *already* occurring at the time of the IPO.  For example, the Offering Documents purported to warn:

> Although we have developed end-to-end quality control procedures through
> our 7+1 Quality Control Procedure across the entire procurement and fulfillment

process, *we cannot assure you that we can always identify every quality control issue* due to potential flaws, loopholes and bugs of our procedures and human errors, and our efforts to patch up or update our quality control procedures may suffer from delays or failures due to external factors not entirely under our control. In addition, there are inherent limitations in sampling inspection of non-standard products such as fresh produce, seafood, meats, which *may* not identi[f]y all the defects and flaws.  Our rapid expansion, which results in increased cooperation with an increasing number of suppliers and business partners, evolving and increasingly complex supply chain, and continued digitalization efforts across the fulfillment process all possess *the potential* to exacerbate the pressure on our quality control procedures, which are in turn required to be reinvented and perfected at a rapid pace.  *We have detected and remedied several cases of sub-par products being sold on Dingdong Fresh, e.g. excessive pesticide or heavy metal residues.  Despite our rectification efforts, we are unable to entirely rule out the possibility that similar incidents will take place again in the future*.  As the performance, reliability and robustness of our quality control procedures are vital to our success, our reputation *may* be materially and adversely affected, our market share *could* decline and we *could* be subject to product recalls, penalties or liability claims *if* we encounter disruptions caused by failures in our quality control procedures.

[Emphasis added.]

At the time, however, Defendants knew Dingdong's quality control procedures were failing, that customers were receiving, for example, products that were past their sell-by date, and that such issues were occurring with enough frequency that Chinese regulators were increasingly scrutinizing Dingdong's supply chain inputs, including its own facilities, which was likely to (and did) negatively impact Dingdong's business, operations, and reputation.

54.     Notwithstanding, Defendants went forward with the IPO.  With the foregoing misrepresentations and omissions in the Registration Statement, Defendants raised *nearly $95.7 million* in gross proceeds.

55.     But when the truth of Defendants' misrepresentations and omissions began to emerge, the price of Dingdong's ADS suffered sharp declines.  For example, on March 17, 2022, a *Beijing News* report was published stating that Chinese regulators launched a probe into the Company for food safety violations uncovered by the local news.  According to the report, "Dingdong replaced labels on expired vegetables and sold frozen fish products as fresh."

56.     On this news, the price of Dingdong's ADS declined over 10.8%, to close at $3.79 per ADS on March 17, 2022.

57.     By the commencement of this action, Dingdong's shares traded as low as $2.51 per ADS, representing a decline of ***over 89%*** from the $23.50 IPO offering price.  As a result, investors have lost tens of millions of dollars.



## **CLASS ACTION ALLEGATIONS**

58.     Plaintiff brings this action as a class action on behalf of all those who purchased Dingdong ADS pursuant or traceable to the Registration Statement (the "Class").  Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Dingdong or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct, in violation of federal law, that is complained of herein.

61. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

62. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a) whether Defendants violated the Securities Act;

      b) whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

      c) to what extent the members of the Class have sustained damages and the proper measure of damages.

63. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

# FIRST CAUSE OF ACTION

**For Violation of §11 of the Securities Act**
**Against All Defendants**

64.     Plaintiff repeats and re-alleges each and every allegation contained above, as if fully set forth herein.

65.     This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

66.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

67.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

68.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omissions of any material facts, and were not misleading.

69.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

70.     Plaintiff acquired Dingdong ADS pursuant to the Registration Statement.

71.     Plaintiff and the Class have sustained damages.  The value of Dingdong ADS has declined substantially subsequent to and due to Defendants' violations.

72.     At the time of their purchases of Dingdong shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the

facts upon which this Complaint is based, to the time that Plaintiff commenced this action.  Less than three years have elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of §12(a)(2) of the Securities Act
### Against All Defendants

73.     Plaintiff repeats and re-alleges each and every allegation contained above, as if fully set forth herein.

74.     By means of the defective prospectus, Defendants promoted, solicited, and sold Dingdong shares to Plaintiff and other members of the Class.

75.     The prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff, and the other members of the Class who purchased Dingdong shares pursuant to the prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated, in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus, as set forth above.

76.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the prospectus at the time Plaintiff acquired Dingdong shares.

77.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Dingdong shares, pursuant to the prospectus, sustained substantial

damages in connection with their purchases of the shares.  Accordingly, Plaintiff and the other members of the Class who hold the ADS issued pursuant to the prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their ADS to Defendants sued herein.  Class members who have sold their ADS seek damages to the extent permitted by law.

## THIRD CAUSE OF ACTION

### For Violation of §15 of the Securities Act
### Against All Defendants Except the Underwriter Defendants

78.     Plaintiff repeats and re-alleges each and every allegation contained above, as if fully set forth herein.

79.     This Cause of Action is brought pursuant to §15 of the Securities Act against all Defendants except the Underwriter Defendants.

80.     The Individual Defendants were controlling persons of Dingdong, within the meaning of the Securities Act.  By virtue of their positions as directors or senior officers of Dingdong or Cogency Global, as alleged above, these Defendants each had the power to influence, and exercised same, over the Company to cause it to engage in the conduct complained of herein.  The Company controlled the Individual Defendants and all of Dingdong's employees.  The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of Dingdong.  Likewise, Cogency Global controlled Defendant DeVries, who signed the Registration Statement at the direction of Cogency Global, in her capacity as employee representative of Cogency Global.

81.     Dingdong, the Individual Defendants, and Cogency Global were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act alleged in the First and Second Causes of Action above, based on their having signed or authorized the signing of the

Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on Plaintiff's own behalf and on behalf of the Class prays for relief and judgement as follows:

A.     Declaring that this action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and each member of the Class, recission, disgorgement, and all other remedies in equity or in law pursuant to the Securities Act;

D.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

E.     Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: August 25, 2022                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                                *s/ Thomas L. Laughlin, IV*
                                                Thomas L. Laughlin, IV
                                                Jonathan M. Zimmerman (*pro hac vice* forthcoming)
                                                The Helmsley Building
                                                230 Park Avenue, 17th Floor
                                                New York, NY 10169
                                                Telephone:  (212) 223-6444

Facsimile:   (212) 223-6334
tlaughlin@scott-scott.com
jzimmerman@scott-scott.com

*Attorneys for Plaintiff Ryan McCormack*